FILED
2013 Sep-11  AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN  DIVISION

| | | |
|---|---|---|
| MARGRETTA SMITH, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | |
| | ) | **CIVIL ACTION NO. 1:11-cv-3787-SLB** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

Plaintiff Margretta Smith ("Plaintiff") brings this action pursuant to Title II of Section 205(g) and Title XVI of Section 1631(c)(3) of the Social Security Act (the "Act"), seeking review of the decision by the Commissioner of the Social Security Administration[1] ("Commissioner") denying her claims for disability and disability insurance benefits ("DIB") and supplemental security income ("SSI").  *See also* 42 U.S.C. §§ 405(g), 1383(c).  After careful review, the court finds that the decision of the Commissioner is due to be affirmed.

## I.     Proceedings Below

Plaintiff applied for DIB and SSI October 7, 2008, alleging disability beginning on August 1, 2004.[2] [R. 107, 113].  The Social Security Administration denied Plaintiff's claims on November 6, 2011. [R. 56].  On December 9, 2008, Plaintiff requested a hearing before an administrative law judge ("ALJ"). [R. 65-66].    Plaintiff's request was granted, and on June 4, 2010, ALJ Denise

---

[1]  Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Therefore, she should be substituted for Commissioner Michael J. Astrue as Defendant in this suit.  *See* Fed. R. Civ. P. 25(d)  ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

[2]  The ALJ subsequently amended Plaintiff's disability onset date at Plaintiff's request during the June 4, 2010 hearing. [R. 28].

Copeland conducted a hearing. [R. 22-53].  On July 9, 2010,the ALJ determined that Plaintiff had not been under a disability, as defined by § 1614(a)(3)(A) of the Act. [R. 21].  After the Appeals Council denied Plaintiff's request for review of the ALJ's decision, that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review. [R. 1].  *See* 42 U.S.C. §§ 405(g) and 1383(c)(3).

A.      **Plaintiff's Hearing Testimony**

At the time of the hearing, Plaintiff was forty-five years old and had a high school education. [R. 29].  She also completed a year and a half of college, during which time she took news writing and journalism classes. [R. 27, 29].  Plaintiff testified that she could read a newspaper and write a grocery list. [R. 30].  Plaintiff's original applications listed a disability onset date of August 1, 2004. [R. 30, 31].  However, during the hearing, the ALJ granted Plaintiff's request to amend her disability onset date to July 1, 2007, which is the date she stopped working. [R. 28].  Plaintiff alleged she could not work due to migraines, foot pain, and back pain.

According to Plaintiff, her back pain began in 1994 when she fractured her lower vertebrae, but she was able to work through 2007. [R. 31, 40].  In 2007, Plaintiff stated that she began to have a hard time sitting because the pain was worse and had spread to her neck and lower back. [R. 31]. Plaintiff testified that her pain was limited to her back and neck and did not radiate to other parts of her body. [R. 32].  Plaintiff also stated that the pain was worse when she woke up in the morning, when she walked, and when she sat for long periods of time. [R. 32].  Plaintiff testified she could only sit, walk, or stand for about five minutes before her pain would begin and she would have to shift weight off her right hip. [R. 31, 32].  Plaintiff stated that she could sit for a total of 30 minutes before she had to get up. [R. 41]. In response to questions from her attorney, Plaintiff stated that she

also had difficulty bending over to tie her shoe or to pick up something. [R. 41].  Plaintiff also testified that stooping and squatting motions cause pain. [R. 42].  Plaintiff stated that she had been "advised not to lift [] more than 10 pounds and that doing so caused elbow and shoulder pain. [R. 42-43].

Plaintiff was currently taking Ultram and Celebrex for her back pain. [R. 33, 34].  According to Plaintiff, these medications helped somewhat but also caused her to become nauseated. [R. 34, 35].  Plaintiff had also received heat massages, which she testified "seemed to help" with the pain. [R. 35].  She also visited a chiropractor but was not currently receiving any chiropractic treatment. [R. 35].

Plaintiff also testified about pain in her right foot. [R. 35].  Plaintiff had surgery to remove a bunion and to treat a toe bone that was shifting away from a joint. [R. 35, 36].  After her bunion returned, Plaintiff had a second surgery in May 2009. [R. 36].  During this second surgery, the doctor placed a plate in her foot. [R. 36].  Plaintiff testified that the second surgery helped "a little bit." [R. 36].  Plaintiff stated that she had to keep her foot elevated for thirty minutes at a time (for a total of two hours a day) while sitting to avoid swelling.  [R. 37, 43].

Plaintiff also discussed her migraines. [R. 38].  She testified that her migraines started in 2000 and that she had them about three times a month. [R. 38].  Plaintiff testified that sun exposure, exhaustion, hormonal changes, and her foot and back pain would trigger her migraines. [R. 39].  According to Plaintiff, her migraine headaches lasted about four days. [R. 38].  Plaintiff was taking Pamelor and Zoloft to treat her migraines. [R. 38].  Plaintiff testified that she stays in a dark room and "is not able to do anything" when she has a migraine. [R. 39].

Plaintiff also stated that her pain makes it difficult for her concentrate and focus and that she

3

fatigues easily. [R. 43].  Plaintiff testified the she requires help putting her shirts on and that she cannot zip any zippers on clothing. [R. 44].  Plaintiff stated that she could wash dishes and do laundry with the help of her 17-year-old daughter. [R. 44].  Plaintiff told the ALJ she "reads and go[es] outside" during the day. [R. 46].  When asked what she did outside, Plaintiff responded that she had "flowers" and "[did] the gardening." [R. 46].  When the ALJ asked Plaintiff how she managed to garden with her back and foot pain, Plaintiff responded that her husband actually did the gardening and she watched him. [R. 46].

### B.      Plaintiff's Medical History

The record contains numerous medical records filed in support of Plaintiff's claims.

### 1.      Back and Neck Pain

Records dating two years prior to her alleged onset date show that Plaintiff sought treatment for back and neck pain.  On August 5, 2009, Plaintiff saw Dr. Maria Danila, M.D. at the Kirklin Clinic. [R. 360].  Treatment notes indicate that Plaintiff had last visited the clinic on February 17, 2009.[3] [R. 360].  During the instant visit, Plaintiff complained of hand numbness and back pain. [R. 360].  Plaintiff reported that the numbness in her hand was waking her up at night. [R. 360].  The numbness would also occur at other times but no specific movements or situations were linked to the onset. [R. 360].  Plaintiff rated her back pain a seven out of ten on a pain scale and also noted that the pain was worse while sitting or standing. [R. 360].  Plaintiff had not seen her primary care physician for either of these problems. [R. 360].  At her initial consultation in February 2009, Dr. Danila recommended a bone density scan, which Plaintiff had not had performed as of the August 2009 visit. [R. 360].  Dr. Danila noted that Plaintiff remained "independent[] with the activities of

---

[3]  The record does not contain treatment notes from the February 17, 2009 visit.

4

daily living." [R. 360].   During the examination, Plaintiff displayed a "good range of motion in the cervical spine" and hips but experienced spasms in her lower back. [R. 360, 361].   Her muscle strength was five out of five  for grip, quads, knees and dorsiflexors of the foot. [R. 361].   X-ray images taken during this visit reported "an asymmetric lumbosacral transition" associated with a "minimal scoliosis." [R. 361].   Dr. Danila diagnosed Plaintiff with mechanical back pain and probable bilateral carpal tunnel syndrome. [R. 361].   Dr. Danila prescribed Flexeril, ibuprofen, and physical therapy for core muscle strengthening. [R. 361].   Dr. Danila also recommended that Plaintiff follow-up with her primary care physician in six to eight weeks for evaluation of her back pain and hand numbness. [R. 361].

Plaintiff sought treatment from a chiropractor, Dr. Steve Knighten, D.C. in September and October 2009. [R. 235-238].   She then  visited Dr. Anthony Pitts, M.D. at the Spain Rehabilitation Center on November 2, 2009. [R. 378].   Plaintiff complained of back pain and suggested that she had some scoliosis identified on x-rays. [R. 378].   Dr. Pitts noted that Plaintiff was "independent with dressing, feeling, grooming, personal hygeine, and toileting." [R. 379].   Examination notes also indicate that Plaintiff  "on occasion may lift some dog food" but had not done so "of late." [R. 379]. Dr. Pitts prescribed Ultram and ordered an electromyograpy ("EMG") to test for radiculopathy. [R. 380].

The EMG was performed on January 20, 2010. [R. 382-384].   The study showed some peripheral nerve abnormalities but there was no evidence of lubar sacral radiculopathy. [R. 384]. Plaintiff saw Dr. Pitts again on January 26, 2010. [R. 376].   Plaintiff reported then that the Ultram did help her back pain and that she felt "somewhat better." [R. 376].   Although she was not pain free, Plaintiff stated that her symptoms were "somewhat more tolerable." [R. 376].   Dr. Pitts prescribed

5

Neurontin and instructed Plaintiff to return in four weeks. [R. 377]. Plaintiff returned on Febraury 23, 2010 for a follow-up evaluation. [R. 373]. Plaintiff stated that her pain continued and that it was radiating down her right leg. [R. 373]. After discussing her ongoing pain, Dr. Pitts continued Plaintiff on her current pain medication and instructed her to take the medicine after eating to avoid feeling nauseous. [R. 374]. Dr. Pitts also instructed Plaintiff to to apply ice packs or heating pads as needed. [R. 374].

Plaintiff saw Dr. Pitts for a fourth time on May 12, 2010. [R. 371]. Dr. Pitts noted that Plaintiff had "incomplete segmentation in the lower lumbar spine" and experienced "radicular symptoms and signs into the right lower extremity." [R. 371]. Treatment notes indicate that Plaintiff remained independent with activities of daily living and she reported the "hardest thing for her to do day-to-day is to put on a pullover shirt." [R. 371]. During this visit, Plaintiff demonstrated "very subtle straight leg raise on the right" and she had ongoing weakness in her great toe that had been operated on twice. [R. 372]. Dr. Pitts diagnosed Plaintiff with transitional vertebrae with incomplete segmentation in the lower lumbar spine. [R. 372]. X-rays revealed degenerative disc disease and "subtle scoliosis." [R. 372, 381].

### 2.    Right Foot Pain

As it relates to her foot pain, the record contains treatment notes from two surgeries associated with a bunion on Plaintiff's right foot. Dr. Gerald Skaziak, DPM, performed the first surgery on July 15, 2004 at Cullman Regional Medical Center. [R. 225, 226]. Surgical notes indicate that Dr. Skaziak performed a bunionectomy with screw fixation. [R. 225]. The record is devoid of any follow-up progress notes from this particular procedure. Plaintiff saw Dr. John Kirchner at the UAB Highlands Clinic on April 1, 2009 and reported a recurrence of the bunion on

her right foot. [R. 392]. She was experiencing pain that had become "quite bothersome" and was "limiting her a great deal." [R. 392]. After discussing various treatment options, Dr. Kirchner performed a second surgery on May 19, 2009. [R. 390]. Plaintiff saw Dr. Kirchner on a number of occasions over the next year for follow-up treatment.

On August 3, 2009, Dr. Kirchner noted that Plaintiff was "doing better" and making "slow and progressive improvements." [R. 353]. Treatment notes from a visit on October 26, 2009 indicate that Plaintiff had "well-healed wounds." [R. 351]. Plaintiff indicated she still had some pain walking but was wearing "normal shoe[s]." [R. 351]. Dr. Kirchner prescribed an orthotic insert that Plaintiff knew was for use when she was "doing activities." [R. 351]. At her next visit on January 25, 2010, Dr. Kirchner noted that Plaintiff did not get the orthotic he prescribed but he commented that her "alignment look[ed] good." [R. 367]. On May 5, 2010, Dr. Kirchner noted that Plaintiff's toe "was looking quite excellent" and that he planned to release her to follow-up in another year. [R. 365]. According to treatment notes from this visit, Plaintiff was "making improvements" and had "done quite well from the reconstructive surgery" but would "always have a little bit of limitation secondary to the prior surgeries on her great toe." [R. 365].

### 3.    Migraines

Regarding her headaches, Plaintiff sought treatment from three different physicians. On September 20, 2006, Dr. John Smith at the Oneonta Baptist Health Center diagnosed Plaintiff with vascular headaches. [R. 316]. Plaintiff saw Dr. Smith again on May 1, 2007. [R. 314]. Treatment notes from that visit also indicate Plaintiff was suffering from vascular headaches. [R. 314].

On May 17, 2007, Plaintiff was seen by Dr. Dinesh Bhambhyani, M.D. who diagnosed her with intractable migraine and rebound headaches caused from excessive use of over-the-counter pain

medication. [R. 329]. Dr. Bhambhyani instructed Plaintiff to refrain from daily aspirin use and he also discussed migraine triggers. [R. 329].

Over two years later, on July 22, 2009, Dr. John Rothrock, M.D., Professor and Vice-Chair of Neurology at UAB School of Medicine examined Plaintiff at Dr. Smith's request. [R. 348]. In a letter to Dr. Smith, Dr. Rothrock noted that Plaintiff took Topamax briefly to treat her migraines but stopped because it was impairing her memory. [R. 348]. Dr. Rothrock also commented that Plaintiff took Atenolol but it caused hair loss. [R. 348]. Dr. Rothrock further noted that treatment of Plaintiff's migraines was complicated by her lack of medical insurance. [R. 348]. He prescribed a generic medication and recommended that if she responded well that she continue the drug for four to six months. [R. 348, 349]. Dr. Rothrock offered to see Plaintiff again if needed. [R. 349].

### 4.    Disability Examination and Agency RFC Assessment

On October 28, 2008, Dr. Zakir Kahn performed a disability examination. [R. 331]. Plaintiff reported that she had experienced back pain for about ten years and that she was unable to sweep or mop for extended periods of time. [R. 331]. Plaintiff also reported having foot pain and headaches. [R. 331]. Dr. Kahn found no tenderness to palpation over Plaintiff's spine and he indicated Plaintiff had a normal range of motion of the lumbar spine. [R. 333]. However, rotation of the hips caused pain in the lumbar spine. [R. 333]. Dr. Kahn noted that Plaintiff had a normal range of motion of all joints in her upper and lower extremities. [R. 333]. Dexterity and grip in both hands was normal. [R. 333]. Plaintiff's heel-toe walking and squatting was normal. [R. 333]. After performing his examination, Dr. Kahn found Plaintiff suffered from lower back pain and a repaired bunion. [R. 333]. According to Dr. Kahn, Plaintiff demonstrated an "ability to sit, stand, walk, handle objects, hearin speaking, and traveling." [R. 333]. Dr. Kahn noted that "lifting [and] carrying may present

8

some limitation." [R. 333].

A state agency medical consultant, Dr. Samuel H. Chastain, M.D., performed an RFC assessment on November 5, 2008. [R. 335-342]. Dr. Chastain reviewed Plaintiff's medical records, including Dr. Kahn's report, treatment notes from Dr. Knighten, her surgical history related to her bunion, and progress notes from Dr. Bhambhyani. [R. 336, 337]. Dr. Chastain concluded that Plaintiff has the following exertional limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of six hours in an 8-hour work day; sit for a total of six hours in an 8-hour work day; unlimited pushing and/or pulling (including the operation of hand or foot controls). [R. 336]. Regarding postural limitations, Dr. Chastain found that Plaintiff could: frequently climb ramps, stairs, ladders, ropes, and scaffolds; frequently balance, stoop, and crawl; and, occasionally kneel and crouch. [R. 337]. Dr. Chastain further opined that Plaintiff had no manipulative, visual, communicative, or environmental limitations. [R. 337-339].

### C.   Vocational Expert Hearing Testimony

A vocational expert ("VE") testified at the hearing that Plaintiff's past relevant work included a deboner or boner, grader, and packer at Tyson's Food. [R. 48]. In response to several hypotheticals posed by the ALJ, the VE testified that someone of Plaintiff's age, education, past work experience, and with her limitations, could perform her past work as a deboner and grader. [R. 48, 49]. The VE also testified that Plaintiff could perform work as an office helper or information clerk, at a hospital or in other settings, answering the phone and giving out information. The VE also stated that Plaintiff could perform work as an assembler, inspector, or automatic machine tender. [R. 50]. According to the VE, these jobs exist in significant numbers in the national economy and would permit Plaintiff to change position every 30 minutes or so. [R. 51]. In response to a question from

Plaintiff's attorney, the VE testified that if Plaintiff's pain (at a level 6) affected her ability to concentrate for two continuous hours, these limitations would preclude work. [R. 52].

## II.    ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).  Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability.  (*Id.*).  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work,

then the claimant is deemed not disabled.  (*Id.*).  If the ALJ finds the claimant unable to perform past

relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).

In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any

other work commensurate with her RFC, age, education, and work experience.  20 C.F.R. §

404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence,

in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age,

education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

In the instant case, the ALJ found that Plaintiff met the insured status required of the Act

through December 31, 2012. [R. 12].  The ALJ then concluded that Plaintiff had not engaged in

substantial gainful activity since July 1, 2007, the alleged onset date. [R. 14].  The ALJ determined

that Plaintiff has the following severe impairments: degenerative joint disease; degenerative disc

disease; scoliosis; and, migraine headaches. [R. 14].  The ALJ also found that Plaintiff has the

following non-severe impairment: possible carpal tunnel syndrome.[4] [R. 14].  Nonetheless, the ALJ

concluded that Plaintiff does not have an impairment or combination of impairments that meets or

medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1. [R. 15].

After consideration of the entire record, the ALJ then determined that Plaintiff has the residual

functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and

416.967(a) with the ability to  change positions every 30 minutes. [R. 16].  The ALJ found that

Plaintiff could occasionally climb stairs and ramps but should avoid ladders, ropes of scaffolds. [R.

16].  The ALJ also noted that Plaintiff could occasionally balance, stoop, or kneel but should never

---

[4]  The ALJ noted that Plaintiff had not alleged any limitations due to this impairment and that none of her physicians had noted any limitation or disability due to this impairment.  Moreover, at the hearing, Plaintiff did not allege she suffered from any problems in her upper extremities.  The ALJ further commented that Plaintiff indicated her primary complaint was back pain and that no evidence existed suggesting any functional limitations due to carpal tunnel syndrome. [R. 15].

crouch or crawl. [R. 16].  Further, the ALJ determined that Plaintiff could frequently reach, handle, finger, and feel but that she should avoid exposure to hazardous conditions such as heights and moving machinery. [R. 16].  Although the ALJ concluded that Plaintiff was unable to perform her past relevant work, the ALJ found that jobs existed in the national economy that she could perform. [R. 20].  These included: assembler, inspector, and automatic machine tender. [R. 21].  Based upon this analysis, the ALJ determined Plaintiff is not disabled. [R. 21].

## III.    Plaintiff's Argument for Reversal

Plaintiff seeks to have the Commissioner's decision reversed, or in the alternative, remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.  First, Plaintiff argues that the ALJ failed to conduct a proper credibility finding. [Pl.'s Mem. 9-14].  Second, Plaintiff argues that no support exists for the ALJ's RFC assessment because the record is devoid of any RFC assessments from any examining or treating physicians or from any non-examining medical expert who had reviewed the entire record in this case. [R. 14-16].  Third, Plaintiff argues that the ALJ's decision is contrary to the substantial evidence of record. [R. 16-17].

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   Title 42 U.S.C. §§ 405(g) and 1383(c)(3) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the

Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.      Discussion

After careful review, the court finds that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied.

### A.      Credibility

Plaintiff contends that the ALJ failed to conduct a proper credibility finding, and therefore, the decision is not supported by substantial evidence. The court disagrees and finds that the ALJ considered the claimant's subjective symptoms and properly rejected them as not credible.

"In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to

the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).  If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so."  *Id.*  Failure to do so "requires, as a matter of law, that the testimony be accepted as true."  *Id.*  Social Security Ruling 96-7p also requires the ALJ's decision to contain "specific reasons" for a particular credibility finding that is supported by the evidence in the case record, and the rationale must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual statements and the reasons for that weight."  Social Security Ruling 96-7p, 1996 WL 374186 (S.S.A. 1996).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, thus satisfying the first prong of the pain standard. However, the ALJ found that Plaintiff was not credible concerning the intensity, persistence, and limiting effects of her symptoms to the extent they were inconsistent with the RFC assessment. [R. 17]. The ALJ considered a myriad of relevant factors in assessing the claimant's subjective complaints, including the objective medical evidence, the effectiveness of Plaintiff's medication and other treatment, and Plaintiff's activities of daily living.

For each of Plaintiff's physical impairments, the ALJ examined the medical records against Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her pain.  Although the ALJ may not reject a claimant's statements about the intensity and persistence of pain solely because the available objective medical evidence does not substantiate the statements, the ALJ is expressly permitted to consider such evidence in making a credibility determination.  *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  First, regarding her back and neck pain, the ALJ noted that when examined by Dr. Kahn pursuant to a consultative examination in October 2008, Plaintiff's physical

14

examination was "completely normal." [R. 17, 331-334].  The ALJ also commented that  Dr. Kahn

opined that Plaintiff demonstrated an ability to sit, stand, walk, and handle objects, but might have

some limitation lifting and carrying. [R. 17, 333].  Plaintiff contends that the ALJ overlooked Dr.

Pitts' diagnosis of degenerative disc disease,  the positive EMG study for peripheral nerve

abnormalitieson the right side, and Dr. Pitts' treatment notes indicating multiple trigger points. [Pl.'s

Mem. 10-11].  The ALJ explictly referenced the degenerative disc disease diagnosis and further cited

the medical evidence on record that showed no evidence of radiculopathy and only slight nerve

abnormalities. [R. 17, 384].  Moreover, although Dr. Pitts noted various trigger points,  examination

notes also show that Plaintiff had no loss of sensation or range of motion issues. [R. 17, 372, 373,

379, 382].  Moreover, although Plaintiff alleges she had "positive straight let raise" on the right side

on multiple occasions [Pl.'s Mem. 10], Dr. Pitts characterized this problem as "suggestive" in

January 2010 [R. 376], "slightly positive" in February 2010 [R. 373], and "very subtle suggestive"

in May 2010 [R. 272].  Based upon this medical evidence, the ALJ discredited Plaintiff's subjective

complaints that her back pain permitted her to sit, stand, or walk for only five minutes.  Although

the ALJ found that the medical evidence demonstrated that Plaintiff had received treatment for lower

back and neck pain that could reasonably limit her ability to engage in certain activity, the ALJ

concluded Plaintiff was not limited to the extent she alleged during the hearing. [R. 17].

Second, regarding her foot pain, the ALJ reviewed the notes from Plaintiff's surgeries on her

right foot to correct her bunion. [R. 18].  The ALJ specifically referred to Dr. Kirchner's notes from

May 2010 indicating that Plaintiff was "looking quite excellent" and releasing her from care at that

time. [R. 18, 365].  Although Dr. Kirchner indicated that Plaintiff would always have "a little bit of

limitation," the ALJ referenced treatment notes indicating that Plaintiff continued to improve from

the surgery. [R. 18, 365, 367, 353]. In her brief, Plaintiff references her two surgeries but does not provide additional information related to the extent of any limitations caused by her foot pain. The same is true regarding her headaches. Although Plaintiff reminds the court that she sought treatment for chronic headaches [Pl. Mem. 11], the ALJ reviewed these records as well and concluded that the evidence does not support the intensity or frequency of the headaches alleged (three times a month lasting four days at a time). [R. 18]. Notably, Plaintiff sought treatment for her headaches four times over the course of three and a half years and three of these four visits occurred prior to the amended alleged onset date of July 1, 2007. [R. 28, 314, 316, 327-329, 348-349].

The ALJ further discredited Plaintiff's testimony regarding the frequency and intensity of her headaches because she did not continue to take prescription medications she found helpful. [R. 18]. Plaintiff argues that the ALJ improperly discredited her testimony for this reason. [Pl.'s Mem. 12-13]. Plaintiff contends the reason she was not taking the prescribed Topomax was because she could not afford it. [R. 38]. Plaintiff cites *Dawkins v. Bowen*, 848 F.2d 1211, 1214 (11th Cir. 1988) as excusing non-compliance due to poverty and contends that the ALJ should have developed the record on this point. [Pl.'s Mem. 13]. The court finds Plaintiff's reliance on *Dawkins* misplaced. As explained and distinguished in *Ellison v. Barnhart*, 355 F.3d 1272, 1274-75 (11th Cir. 2003), in *Dawkins*, the denial of benefits was based solely on noncompliance, thus the ALJ should have developed the record on that point. *Ellison*, 355 F.3d at 1275 (citing *Dawkins*, 848 F.2d at 1211-1214). In *Ellison*, the Eleventh Circuit affirmed the ALJ's consideration of non-compliance as one of several factors regarding credibility because the disability denial was not significantly based upon the finding of non-compliance. *Id.* Here, as in *Ellison*, the denial of benefits was based upon a number of factors including, but not limited to the VE's testimony, Plaintiff's RFC, age, educational

16

background, and work experience, and other medical evidence.  Plaintiff's non-compliance was one of several factors considered in assessing her credibility and thus, the ALJ was not required to further develop the record on this point.[5]

The ALJ also considered the type, dosage, effectiveness, and adverse side effects of any medication and any treatment, other than medication, used to relieve Plaintiff's symptoms in assessing her credibility.  On this point, the ALJ considered that Plaintiff had visited a chiropractor and her testimony that would change position due to her back pain and would stay in a dark room when she had headaches. [R. 18].  The ALJ also noted that Plaintiff testified she used a heat massager and other medication, both of which provided relief. [R. 18].  Although Plaintiff suggested she experienced  nausea when taking her pain medication, she indicated she would continue to do so because it worked well. [R. 19].

The ALJ further considered Plaintiff's activities of daily living in assessing her credibility. The Eleventh Circuit has commented that "participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability.  *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11 th Cir. 1997).  Moreover, courts have recognized that a claimant need not be bedridden in order to be disabled.  *See Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003).  However, the ALJ is expressly permitted to consider activities of daily living when making credibility determinations. *See* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); *Dyer v. Barnhart*, 395 F.3d 1206, 1208, 1212 (11th Cir. 2005) (consideration of claimant's activities of daily living, including limited housework, driving short distances, and reading the paper, was permissible as part

---

[5]  Notably, although Plaintiff testified at the hearing that she was not taking Topomax because she could not afford it [R. 38-39], Dr. Rothrock's examination notes indicate she stopped taking it because it impaired her memory. [R. 348].  Furthermore, on a headache questionnaire she completed in October 2008, Plaintiff stated that Topomax made her forgetful.  [R. 168].

of credibility determination).

The ALJ considered Plaintiff's testimony that she washed dishes, did laundry, and other household chores with her daughter and husband. [R. 19].  The ALJ also noted that Plaintiff testified that she would garden with her husband–or at the very least watch him garden. [R. 19].  The ALJ further referenced Plaintiff's function report in which she noted that she makes breakfast and dinner, goes grocery shopping, attends religious meetings, and home schools her daughter for three hours a day. [R. 17, 173].  According to her testimony, Plaintiff has no problems with her personal care other than raising her arms. [R. 19].  Thus, the ALJ concluded that these described daily activities were not limited to the extent Plaintiff suggested and found them to be consistent with the demands of sedentary work. [R. 19].

Based upon the foregoing, the court finds that the ALJ's rationale for rejecting the claimant's subjective complaints of disabling pain provides the specificity required to withstand any allegations of error.  The ALJ is the sole determiner of credibility. *Daniels v. Apfel*, 92 F. Supp. 2d 1269, 1280 (S.D. Ala. 2000) (citing *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971)).  Consequently, the court should not disturb a clearly-stated credibility finding unless substantial evidence does not support it. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  The ALJ's assessment of Plaintiff's credibility is clearly articulated and corroborated by substantial evidence in the record; therefore, the court concludes that substantial evidence exists to support the ALJ's conclusion that the plaintiff's testimony of disabling pain is disproportionate to the objective medical evidence.

## B.      The ALJ's RFC Assessment is Supported by Substantial Evidence

Next, Plaintiff argues that the Commissioner's decision is not supported by substantial evidence reversed because the record does not contain an examining physician's opinion

18

substantiating the ALJ's RFC findings.  [Pl.'s Mem. 14].  This argument is without merit.

The determination of a claimant's RFC is an administrative determination reserved to the Commissioner.  20 C.F.R. §§ 404.1546, 416.946.  In fact, "[t]he term 'residual functional capacity assessment' describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."  Social Security Ruling 96-5p.

Plaintiff contends, in error, that an RFC assessment is a medical assessment and quotes language from Social Security Ruling 83-10, 1983 WL 31251 (S.S.A. 1983) defining it as such. [Pl.'s Mem. 14].  As another court in this district explained in *Lanlgey v. Astrue*, 777 F. Supp. 2d 1250, 1252 (N.D. Ala. 2011), the language Plaintiff quotes from Social Security Ruling 83-10 is found in the glossary section of the ruling that includes citations to 20 C.F.R. § 404.1545.  In 1983, 20 C.F.R. § 404.1545 stated that a residual function capacity was a medical assessment.  *Langley*, 777 F. Supp. 2d at 1252.  However, under the current regulations, RFC is not a medical assessment. In 1991, 20 C.F.R. § 404.1545 was amended to delete language referring to RFC as a medical assessment.  As recognized by this court in *Langley*, the current version of the regulation provides in relevant part: "'Your residual functional capacity is the most you can still do despite your limitations.  We will assess your residual functional capacity based upon all the relevant evidence in your case record.'"  *Langley*, 777 F. Supp. 2d at 1252 (quoting 20 C.F.R. § 404.1545). Accordingly, that no examining or treating physician supplied an work RFC assessment regarding

Plaintiff's capacity to work is of no moment.

Here, the ALJ considered the entire record and concluded that Plaintiff could perform sedentary work with some postural limitations. [R. 16].  The ALJ considered Plaintiff's subjective symptoms and limited her standing, walking, lifting, carrying, balancing, climbing, stooping, kneeling, crouching, crawling, and exposure to hazards. [R. 18].  The ALJ also accounted for Plaintiff's need to adjust positions in order to alleviate pain. [R. 18].   In making her RFC findings, the ALJ further relied upon  various medical opinions.

First, the ALJ cited Dr. Kirchner's May 2010 assessment, which indicated that Plaintiff may always have some limitations secondary to her foot surgery but that she had done quite well from the reconstructive surgery and would be released from care. [R. 19, 365].   The ALJ properly accorded "significant weight" to this opinion.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (reiterating the Eleventh Circuit's rule that absent good cause, the opinion of a treating physician must be given "substantial" or "considerable" weight).  Second, the ALJ properly accorded "some weight" to Dr. Chastain's opinion that Plaintiff could perform a restricted range of light work.  *See Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (noting that the opinion of a non-examining reviewing physician is entitled to little weight, and taken alone, does not constitute substantial evidence to support an administrative decision).   Although the ALJ noted that Dr. Chastain's opinion supported the conclusion that Plaintiff could perform some work activity, the ALJ found that Plaintiff had greater limitations than those identified by Dr. Chastain based upon her subjective complaints and the evidence received at the hearing. [R. 19].   Third, the ALJ accorded "some" weight to the report of one-time examiner Dr. Khan. [R. 19].   Although not entitled to special deference, *see McSwain v. Bowen*, 814 F.2d 617, 619 (11 th Cir. 1997), the ALJ noted Dr.

Khan's opinion regarding Plaintiff's ability to lift and carry were consistent with the evidence of record. However, based upon new evidence and Plaintiff's additional foot surgery, the ALJ found that Plaintiff had limitations in standing and walking. [R. 19].

Citing *Coleman v. Barnhart*, 264 F. Supp. 2d 1007 (S.D. Ala. 2003), Plaintiff maintains that the ALJ's reliance upon a "review of the record as a whole," including her allegations and testimony, objective medical findings, medical opinions, and other relevant evidence does not suffice. In *Coleman*, the court concluded that the ALJ's finding that the claimant retained the RFC to perform medium work was not supported by substantial evidence. *Id.* at 1010. The court found it "unclear" how:

> the ALJ found plaintiff could meet the threshold physical requirements of medium work, in absence of a physical capacities evaluation ("PCE") completed by a treating or examining physician, particularly in light of plaintiff's numerous severe impairments. This Court has held on a number of occasions that the Commissioner's fifth-step burden cannot be met by a lack of evidence, or by the residual functional capacity assessment of a non-examining, reviewing physician, but instead must be supported by the residual functional capacity assessment of a treating or examining physician.

*Id.* Plaintiff cites this language in support of her position. Although the Eleventh Circuit has not issued a published opinion directly on point, Plaintiff overlooks that the recent trend among courts in the Eleventh Circuit rejecting this blanket proposition. Most notably, in *Langley*, this court found Coleman at odds with the regulations, Supreme Court precedent, and unpublished decisions in the Eleventh Circuit. *Langley*, 777 F. Supp. 2d at1260. As explained in *Langley*, and as a basis for its holding that the law of the Eleventh Circuit does not require an RFC from a treating physician, the court stated:

In *Green v. Social Security Administration,* the court found the ALJ had properly

21

refused to credit a Physical Capacities Evaluation ("PCE") from claimant's treating physician.   223 Fed.Appx. 915, 922–23 (11th Cir. 2007). The court rejected claimant's argument that without the PCE, there was nothing in the record upon which the ALJ could base his RFC finding. *Id.* at 923. The court held that other evidence from the plaintiff's doctors (which did not contain a PCE or RFC assessment) was sufficient to support the ALJ's finding that the claimant could perform light work. *Id.* at 923–24.

*Langley*, 777 F. Supp. 2d at 1258.  And, like *Langley*, numerous other courts have affirmed an ALJ's RFC determinations in the absence of any assessment performed by an examining or treating physician.  *See e.g.*, *Clark v. Astrue*, 2012 WL 2958216, at *4 n.4 (S.D. Ala. July 19, 2012) (substantial evidence need not include a physician's RFC or PCE)*; Daniels v. Astrue*, 2012 WL 353756, at *4 (M.D. Ala. Feb. 2, 2012) ("Contrary to Plaintiff's argument, there is no rule of law [in *Coleman*] which requires that an ALJ's RFC determination be supported by an assessment from a physician."); *Menses v. Astrue*, 2011 WL 1595157, at *4 (S.D. Fla. Apr. 4, 2011) (the ALJ is not precluded from making an RFC determination in "the absence of an opinion from an acceptable medical source"); *Fox v. Astrue*, 2009 WL 2899048, at *6 (S.D. Ala. Sept. 3, 2009) (citing Social Security Ruling 96-8p) ("The RFC assessment must be based on all of the relevant evidence in the case such as: medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, and medical source statements."); *Cooper v. Astrue*, 2009 WL 537148, at *7 (M.D. Ga. Mar. 3, 2009) (refusing to "read into every case a requirement that the ALJ obtain a residual functional capacity assessment from a treating or examining physician").

The ALJ properly considered the record as a whole, including Plaintiff's allegations and testimony and various medical opinions in making her RFC determination.  As explained in detail above,  there is no requirement that the record contain a treating or examining physician's opinion

22

substantiating the ALJ's RFC findings.  Thus, the court concludes that the Commissioner's decision is not due to be  reversed on this ground.

### C.     Substantial Evidence Supports the ALJ's Conclusion That Plaintiff Does Not Meet Listing 1.04

Plaintiff's third argument in support of reversal is captioned as a broad suggestion that the ALJ's findings are contrary to the substantial evidence of record in this case. [Pl.'s Mem. 9, 16]. After reviewing the substance of this argument, the court construes this allegation as one specifically attacking the ALJ's determination that Plaintiff did not meet Listing 1.04. [See Pl.'s Mem. 16-17].

As recognized by the Supreme Court, "[f]or a claimant to show that [her] impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  The claimant has the burden of proving that an impairment meets or equals a listed impairment.  *Wilkinson ex. rel Wilkinson v. Bowen*, 847 F.2d 660, 662 (11th Cir. 1987).  More specifically:

> To "meet" a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement.  To "equal" a Listing, the medical findings must be "at least equal in severity and duration to the listed findings." If a claimant has more than one impairment, and none meets or equals a listed impairment, the Commissioner reviews the impairments' symptoms, signs, and laboratory findings to determine whether the combination is medically equal to any listed impairment.

*Wilson v. Barnhart*, 284 F.3d 1219,  1224 (11th Cir. 2002).

Listing 1.04 provides in relevant part:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal

23

stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .

20 C.F.R. Part 404, Subpart P, App. 1, Listing 1.04.

The ALJ concluded that Plaintiff's impairment of degenerative disc disease did not meet Listing 1.04 because she did not have one of the listed disorders *in conjunction with* evidence of nerve root compression. [R. 15] (emphasis in original).  The ALJ stated that although Plaintiff had degenerative changes to her spine, there was no evidence in the record of nerve root compression. [R. 16].  Plaintiff contends this is a misstatement of the medical records in this case because an August 5, 2009 x-ray showed the right transverse process of L5 to be enlarged and articulating with the subjacent sacral ala. [Pl.'s Mem. 17; R. 388].  Plaintiff does not explain how this evidence indicates nerve root compression.  Additionally, Plaintiff relies on reports of positive straight leg raise on several occasions and a positive EMG study. [Pl.'s Mem. 21].  Regarding the positive straight leg raise, Dr. Pitts noted "suggestive" [R. 376], "slightly positive" [R. 373], and "very subtle suggestive" [R. 372] leg raise, but his treatment notes do not reflect positive straight leg raise in both the sitting and supine positions, as required by Listing 1.04.  Although the EMG study that showed "peripheral nerve abnormalities," [R. 384] Plaintiff fails to articulate how this result demonstrates nerve root compression accompanied by sensory or reflex loss, as required by Listing 1.04. Plaintiff's physical examination on the day of the EMG indicated "no significant sensation changes

24

bilaterally" and normal reflexes at the knee and ankle.[6] [R. 382].

Plaintiff also maintains that the ALJ's determination that she did not meet listing 1.04 is not supported by substantial evidence because the ALJ noted that all of Plaintiff's physical examinations "have been normal." [Pl.'s Mem. 17; R. 17].   Contrary to Plaintiff's assertion, the ALJ did not state that *all* of Plaintiff's examinations have been normal.   The ALJ correctly noted that when examined by Dr. Khan pursuant to a consultative examination, her physical examination was completely normal. [R. 17].   However, after making this observation, the ALJ listed in detail results of other examinations indicating a variety of limiting diagnoses, and based upon that evidence, the ALJ found Plaintiff has limitations in standing and walking. [R. 17, 19].   Thus, the ALJ found that Plaintiff has further limitations than those suggested by the state agency medical examiner. [R. 19].

The ALJ's determination that Plaintiff did not meet listing 1.04 is supported by substantial evidence and the Commissioner's decision is not due to be reversed on this ground.

## VI.   Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and that proper legal standards were applied.   Therefore, the Commissioner's final decision is due to be affirmed.   A separate order in accordance with this memorandum opinion will be entered.

Done this 10th day of September, 2013.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE

---

[6]   Examination notes indicate that Plaintiff's reflexes at the knee and ankle were "2+." [R. 382].   The measure of a normal reflex is 2+. The Precise Neurological Exam (last visited September 5, 2013), New York University School of Medicine, http://informatics.med.nyu.edu/modules/pub/neurosurgery/reflexes.html.